## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Potbelly Sandwich Works, LLC, | |
| Plaintiff, | |
| v. | Case No. |
| Network Innovations, Inc., an Illinois Corporation d/b/a Nitel, Inc.; Ronald Grason; Paul Rios; James Hessmer; Michael Montalto; Anthony Buglio; High Mountain Consulting, Inc., an Illinois Corporation; and Techcule, LLC, an Illinois Limited Liability Company, | JURY DEMAND |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiff, Potbelly Sandwich Works, LLC ("Potbelly"), brings this Complaint

against Network Innovations, Inc., an Illinois Corporation d/b/a Nitel, Inc. ("Nitel"),

Ronald Grason, Paul Rios, James Hessmer, Michael Montalto, Anthony Buglio, High

Mountain Consulting, Inc., ("High Mountain"), and Techcule, LLC, ("Techcule") and

alleges the following:

## SUMMARY

1.     This case arises out of a bribery and kickback scheme devised by Nitel and perpetrated by Nitel and the remaining defendants against Potbelly.

2.     Nitel bribed Potbelly employees, Defendants Michael Montalto and Anthony Buglio, into steering Potbelly business to Nitel. Under the scheme, Nitel secretly agreed to make kickback payments to Montalto and Buglio for any Potbelly business they directed to Nitel. The more business provided, the larger the kickback payment. Within weeks of finalizing the kickback scheme in writing, Montalto and Buglio started delivering the Potbelly business.

3.     The defendants concealed the scheme for years, reaping hundreds of thousands of dollars from Potbelly in the process and fraudulently obtaining Potbelly service orders for more than 60 shop locations throughout the country.

4.     Nitel's actions are part of a concerted effort by its executive leadership team to defraud Potbelly and reaches the highest ranks in the company, including its President (Defendant Ronald Grason), General Counsel (Defendant Paul Rios), senior sales executive (Defendant James Hessmer), and others. The defendants have engaged in civil conspiracy, breached and induced the breach of fiduciary duties, committed fraud, fraudulently induced Potbelly into a contract and violated various state and federal laws including the Civil RICO statute, the Computer Fraud and Abuse Act, and the Illinois Consumer Fraud and Deceptive Practices Act. In addition to seeking damages, Potbelly seeks a declaratory judgment that the Potbelly-Nitel contracts are void.

## PARTIES

5.      Plaintiff Potbelly is an Illinois Limited Liability Company whose sole member is Potbelly Illinois, Inc., an Illinois corporation with its principal place of business in Illinois, which is itself a wholly owned subsidiary of Potbelly Corporation, a Delaware corporation with its principal place of business in Illinois. Potbelly operates, through subsidiary entities, more than 430 sandwich shops throughout the United States.

6.      Defendant Nitel has its principal place of business in Chicago, Illinois. Nitel holds itself out as a provider of telecommunications services.

7.      Defendant Ronald Grason, a citizen of Illinois, is and at all relevant times has been the President of Nitel.

8.      Defendant Paul Rios, a citizen of Illinois, is and at all relevant times has been the General Counsel of Nitel.

9.      Defendant James Hessmer, a citizen of Illinois, is and at all relevant times has been a senior sales executive for Nitel.

10.      Defendant Michael Montalto, a citizen of Illinois, was the Senior Director of Information Technology for Potbelly until his termination on July 20, 2018.

11.      Defendant Anthony Buglio, a citizen of Illinois, was a Manager, Infrastructure and Networking for Potbelly until his termination on July 20, 2018.

12.      Defendant High Mountain Consulting, Inc. ("High Mountain") is an Illinois corporation with its principal place of business in Illinois. High Mountain was

created by Montalto for the purpose of receiving Montalto's kickback payments from Nitel.

13.     Defendant Techcule, LLC is an Illinois limited liability corporation created by Buglio for the purpose of receiving Buglio's share of kickback payments from Nitel or derivatively from Montalto or High Mountain.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, in that the action presents questions arising under the laws of the United States, including 18 U.S.C. § 1964(c) and 18 U.S.C. § 1030(g).

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that each of the defendants is a resident of Illinois and one or more of them reside within this judicial district, and in that a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## BACKGROUND

## Montalto and Buglio Employment at Potbelly

16.      Potbelly operates approximately 430 company-owned and 40 franchise sandwich shops in 34 states within the United States.

17.     Potbelly sandwich shops utilize telecommunications services both for traditional phone services and for internet data transmission and receipt. These telecommunications are vital for the operation of the sandwich shops both in terms of their interactions with their customer base (including telephone and on-line ordering)

and their interactions with company headquarters in Chicago and vendors (such as reporting of sales, payroll, and ordering functions).

18. Defendant Montalto was employed in Potbelly's Information Technology department from 2015 until July 2018. Montalto was originally hired as a Director, Infrastructure and Network Operations, and was promoted on March 26, 2018 to the role of Senior Director of Information Technology.

19. At all relevant times, Montalto's responsibilities within Potbelly included analyzing and providing technological solutions for Potbelly's telecommunications needs, and identifying, evaluating, recommending and overseeing providers of telecommunications services.

20. Defendant Buglio was employed in Potbelly's Information Technology department from December 2015 until July 2018. Buglio was hired as a Network Engineer and promoted on March 26, 2018 to the role of Manager, Infrastructure and Networking Services. Buglio was subordinate to Montalto.

21. Before becoming employed by Potbelly, Buglio was employed as a senior network administrator for Nitel.

### Nitel's Kickback Agreements with Montalto and Buglio

22. Nitel holds itself out as a provider of integrated network and telecommunications services to businesses. Starting no later than 2016, Nitel identified Potbelly and its nationwide shop locations as a strategic target for its services.

23.    Unable to obtain a service agreement for a single Potbelly shop, Nitel conspired with Potbelly employees Montalto and Buglio to steer the Potbelly business to Nitel through a kickback scheme.

24.    In September 2016 Nitel and Montalto (through High Mountain) entered into what was captioned as an "Independent Sales Representative Agreement" which recited that Nitel "desires to expand its customer base" and authorized Montalto to "refer and solicit orders" from prospective commercial subscribers (hereinafter the "Montalto-Nitel Agreement"). In consideration, Nitel agreed to kick back a portion of the profits to Montalto in the form of "Commissions." The Montalto-Nitel Agreement, signed by Montalto on behalf of High Mountain and defendant Rios on behalf of Nitel, is attached hereto as Exhibit 1.

25.    Nitel and Buglio (through Techcule) entered into a substantially identical "Independent Sales Representative Agreement" in late 2016 or early 2017. The Buglio-Nitel Agreement, signed by Buglio on behalf of Techcule and Rios on behalf of Nitel, is attached hereto as Exhibit 2.

26.    With the kickback scheme in place, Montalto and Buglio began a concerted effort to award a Potbelly contract for telecommunications services to Nitel.

27.    Less than four weeks after Montalto and Nitel executed the Montalto-Nitel Agreement, Montalto (ostensibly acting on behalf of Potbelly) and Nitel executed the first-ever "Service Agreement" between the two companies (the "Potbelly-Nitel Services Agreement"). Pursuant to the Potbelly-Nitel Services Agreement, Nitel would issue a "Service Order Form" for each Potbelly store location and Potbelly would

execute the form indicating its purported acceptance. The Potbelly-Nitel Service Agreement is attached hereto as Exhibit 3. An example of an executed "Service Order Form" is attached hereto as Exhibit 4.

28.     Montalto immediately began executing "Service Order Forms" pursuant to which Potbelly ostensibly awarded telecommunication service work to Nitel. Through the kickback scheme Nitel expanded its business with Potbelly from no shop locations in 2016 to more than 60 locations throughout the country by July 2018, a number that would have continued to increase had Potbelly not discovered information relating to the scheme.

29.     Since the Potbelly-Nitel Service Agreement was entered into, Potbelly has paid hundreds of thousands of dollars to Nitel, which has in turn paid tens of thousands of dollars in kickbacks, in the form of "Commissions," to Montalto, Buglio, and/or their companies High Mountain and Techcule.

<u>**Defendants Conceal the Scheme**</u>

30.     The arrangement whereby Montalto and Buglio would act in the interests of themselves and Nitel, while appearing to be acting solely on behalf of Potbelly, was devised and overseen by the highest-level executives at Nitel.

31.     Defendant Grason (Nitel's President) repeatedly interacted directly with Montalto in furtherance of the kickback scheme and was personally involved in the allocation of kickback payments among Montalto and Buglio. Grason provided explicit instructions to his subordinates regarding "check cutting" to the companies established for payment by Montalto and Buglio.

32.     Defendant Rios (Nitel's General Counsel) was also fully aware of the scheme. Within a matter of weeks he signed one agreement on behalf of Nitel to kick back a portion of the revenues disguised as "Commissions" to Montalto, and another agreement to provide telecommunications services to Potbelly, both of which were countersigned by Montalto (one on behalf of High Mountain, the other ostensibly on behalf of Potbelly).

33.     In January 2017, Montalto wrote to Grason and Rios, specifically identifying both the "Potbelly Account" and High Mountain, and providing "my company information" including taxpayer ID number, and inquiring whether other information was needed to "ensure . . . that my commissions earnings [sic] will be paid correctly?" Nitel President Grason responded directly, copying Nitel General Counsel Rios, with specific instructions for payment for the benefit of both High Mountain and Techcule.

34.     Defendants were each aware of the need to conceal this arrangement from Potbelly and successfully did so for years.

35.     Nitel, in an effort to conceal the scheme from Potbelly, arranged for the Nitel Service Order Forms for Potbelly to omit the customary identification of the sales "agent," so that Potbelly would not discover that its own employee Montalto—who was negotiating and administering the Potbelly-Nitel relationship on behalf of Potbelly—was acting as an agent for Nitel.

36.     Instead, the portion of the "Service Order Forms" where an "agent" was to be listed was either left blank or affirmatively stated there was "NO" agent. *See* Ex. 4.

37.     This concealment of the "agent" information on Nitel's invoices to Potbelly was done at the direction of defendant Hessmer, with the express intent that Potbelly not learn of the arrangement with Montalto and Buglio.

38.     Montalto and Buglio were equal participants in concealing this arrangement, never once disclosing its existence to Potbelly and later destroying records to cover it up.

## Termination of Montalto and Buglio

39.     Upon discovering and investigating information related to the scheme in July 2018, Potbelly terminated the employment of Montalto and Buglio, and notified Nitel of Potbelly's discovery that Nitel had been issuing "commission" payments to High Mountain and/or Techcule in connection with the Potbelly-Nitel telecommunications business. Potbelly demanded from Nitel an accounting of amounts paid pursuant to this arrangement, and demanded that all such payments cease. Nitel complied with none of these demands (and has continued to this day paying High Mountain a percentage of Nitel's Potbelly billings) and has failed to confirm or deny the existence or terms of its arrangements with Montalto, Buglio and/or their companies.

40.     Also upon learning of information related to the scheme, Potbelly began taking steps to terminate then-existing plans for Nitel to provide services to additional Potbelly sandwich shop locations (as had been in the "pipeline" before the scheme was discovered), and to provide for the orderly transition of all Potbelly locations already being serviced by Nitel to alternative, responsible and ethical providers.

41.     During the course of investigating the arrangement its former employees had forged with Nitel, Potbelly learned that the Nitel contract provided for charges well in excess of competitive market rates for the services provided.

42.     In furtherance of their fraudulent and wrongful scheme to obtain personal financial benefits at Potbelly's expense, Buglio and Montalto each used their Potbelly-provided laptop computers to access company information which they had no legitimate business purpose for accessing, and which exceeded their authorizations from Potbelly.

43.     Buglio and Montalto wrongfully and without authorization circumvented Potbelly's security systems, and also "hacked" the Potbelly email accounts of several Potbelly senior officers, in part to further their fraudulent scheme to drive business to Nitel.

44.     Immediately after Buglio's and Montalto's terminations, Buglio and Montalto, acting in concert and without authorization, remotely "wiped" Buglio's Potbelly-issued laptop computer in order to hinder Potbelly's investigation into his and Montalto's wrongdoing, thus removing all data previously existing on that computer.

45.     Prior to or at the time of Montalto's termination, Montalto installed a code or software on his Potbelly-issued laptop computer in order to prevent access to that computer without a password that was not made known to Potbelly. Montalto's actions were taken without authorization and in direct contravention of Potbelly policies and procedures, and circumvented Potbelly's internal programs and procedures for

company-issued computer access and security. Following Montalto's termination, he refused to provide the password to Potbelly.

**COUNT ONE**

**BREACH OF FIDUCIARY DUTY**
**(Against Montalto and Buglio)**

46.     Plaintiff incorporates paragraphs 1 through 45 as though fully set forth herein.

47.     Agents, including employees, owe fiduciary duties of loyalty to their principal/employer not to exploit their positions within the company for their own personal benefit.

48.     Montalto and Buglio owed those duties not only pursuant to the law of agency, but also because they both acknowledged and agreed to be bound by the policies contained in Potbelly's Employee Handbook and Ethics Code of Conduct, including policies against accepting money from vendors. Each of Montalto and Buglio acknowledged receiving and reviewing these policies before they participated in the scheme to steer Potbelly's business to Nitel in exchange for money.

49.     Montalto and Buglio both had positions as agents for Potbelly charged with acting for the benefit of Potbelly. By accepting money from Nitel in return for steering Potbelly's business to Nitel, Montalto and Buglio breached their fiduciary duties of loyalty.

50.     As a direct and proximate result of Montalto's and Buglio's breaches of their fiduciary duties of loyalty, Potbelly suffered injuries including but not limited to

11

paying above-market rates for telecommunications services, and paying compensation for Montalto's and Buglio's services.

## COUNT TWO

### INDUCEMENT OF BREACH OF FIDCIARY DUTY
### (Against Nitel, Grason, Rios and Hessmer)

51.     Plaintiff incorporates paragraphs 1 through 50  as though fully set forth herein.

52.     A third party who colludes with a fiduciary in committing a breach of duty, or induces or participates in such a breach, and obtains benefits therefrom is directly liable to the aggrieved party.

53.     Each of defendants Nitel, Grason, Rios and Hessmer colluded with, and induced or participated with, Montalto and Buglio in committing their breaches of their fiduciary duties.

54.     Each of defendants Nitel, Grason, Rios and Hessmer obtained benefits from the breaches of fiduciary duties committed by Montalto and Buglio. These defendants obtained the benefit of wrongfully obtained business that they would not have otherwise received, including through the charging of above-market rates for services provided. In addition, defendant Hessmer was directly compensated for all amounts received from Potbelly as a result of those breaches.

## COUNT THREE

### FRAUD
### (Against Nitel, Grason, Rios, Hessmer, Montalto and Buglio)

55.     Plaintiff realleges paragraphs 1 through 45 as though fully set forth herein.

12

56.     At all relevant times, each of Nitel, Grason, Rios, Hessmer, Montalto and Buglio knew that Montalto and Buglio were acting not solely in the interests of Potbelly, but in the interests of each of the defendants.

57.     At all relevant times, each of the defendants was aware that Montalto and Buglio stood to receive, and were receiving, compensation from Nitel for steering Potbelly's business to Nitel.

58.     At no time did any of the defendants disclose to Potbelly that Montalto and Buglio stood to receive, or were receiving, compensation from Nitel for steering Potbelly's business to Nitel.

59.     Defendants took affirmative steps to prevent Potbelly's discovery of the fact that Montalto, Buglio or businesses controlled by them were acting as agents of Nitel, including by ensuring that Service Order Forms either misleadingly omitted "agent" information, or affirmatively and falsely stated that there were no "agents" involved.

60.     The decision to omit the "agent" information from Potbelly Service Order Forms was done at the express direction of defendant Hessmer communicated to Nitel's Sales Commission Analyst on or about July 11, 2017, for the stated purpose of preventing Potbelly from learning that one or more of its own employees was personally benefitting from steering work to Nitel, and with the express realization that if Potbelly learned of the arrangement, it would lead to termination of any Potbelly-Nitel relationship.

61.     The information that defendants worked to conceal from Potbelly was material, and had it been learned earlier would have led to the avoidance or termination of any Potbelly-Nitel relationship.

62.     Potbelly reasonably relied upon its understanding that its employees were acting as its agents and in its interests, in accordance with the standards contained in the Potbelly Employee Handbook and Ethics Code of Conduct, and not for their own self-enrichment or the undue enrichment of third parties.

63.     As a direct and proximate result of defendants' fraudulent acts and omissions, Potbelly suffered damages to be proved at trial, including the inflated costs of the services provided by Nitel, and the costs associated with replacing Nitel with a responsible vendor.

## **COUNT FOUR**

### **CIVIL RICO, 18 U.S.C. § 1964(c)**
### **(Against Nitel, Grason, Rios and Hessmer)**

64.     Plaintiff realleges paragraphs 1 through 45 and 55 through 63  as though fully set forth herein.

65.     Nitel, Grason, Rios and Hessmer are all culpable "persons" within the meaning of 18 U.S.C. § 1961(3), who together formed an association in fact with structure, continuity, hierarchy, differentiation of roles and a common purpose, which willfully and knowingly committed racketeering activity through a pattern of fraudulent transactions while  engaged in, and having an  effect upon, interstate commerce.

14

66.     Since the execution of the Montalto-Nitel Agreement in September 2016, Grason, Rios and Hessmer have overseen and conducted a pattern of racketeering affecting interstate commerce, including by entering into the Service Agreement executed on ostensible behalf of Potbelly by Montalto, despite these defendants' knowledge that Montalto was being paid by Nitel to act as the agent of Nitel; by entering into dozens of Service Order Forms (each awarding Nitel the right to provide telecommunications services to a different Potbelly location at above-market prices) throughout 2017 and 2018, also executed on ostensible behalf of Potbelly by Montalto; by actively concealing the existence of an "agent" receiving commissions from Potbelly's business, in some instances by leaving the "agent" section of the paperwork blank, and in others by affirmatively but falsely stating that there was no agent on the transaction; and by issuing monthly invoices to Potbelly throughout 2017 and 2018 and beyond charging above-market rates for business that was obtained, and prices that were arrived at, via the fraudulent relationship with Montalto.

67.     All of the above-referenced documentation constituting the pattern of racketeering activity was transmitted via interstate wires or the U.S. Mail.

68.     Both the activity of Nitel generally, and the activity of the enterprise in fact with regard to this racketeering activity, were conducted in and affect interstate commerce.

69.     The racketeering activities identified in paragraph 66 entailed dozens of discrete instances of similar and repetitive behavior spanning at least the 2016-2018 time

frame. Each new Service Order Form, and each invoice, constituted a discrete attempt to defraud Potbelly.

70.     Potbelly is not the only Nitel customer whose telecommunications business Nitel has acquired by secretly agreeing to pay, and paying, the customer's agent purported "Commissions" (*i.e.,* bribes and kickbacks). This is Nitel's practice as to multiple customers.

71.     These acts, as they related both to Potbelly and other Nitel customers, are and have been related to one another and continuous throughout at least the 2016-2018 time frame. These acts satisfy the RICO requirement for a closed-ended scheme, and also carry a threat of continuity into the future.

72.     Defendant Grason engaged in the fraudulent racketeering activity by meeting and planning the scheme—*i.e.,* the use of an ostensible Potbelly agent to act as Nitel's agent without Potbelly's knowledge—directly with Montalto, both at the time the Nitel-High Mountain agreement was entered into in September 2016 and the time the Nitel-Potbelly Service Agreement was entered into in October 2016, even though Grason's regular duties as President of Nitel do not involve dealing with Nitel's independent sales agents.

73.     Defendant Hessmer engaged in the fraudulent racketeering activity by coordinating Potbelly service accounts with Montalto, and by affirmatively instructing Nitel's Sales Commission Analyst to omit identification of High Mountain or any other agent on Service Order Forms for Potbelly accounts, for the express purpose of keeping Potbelly from learning of the scheme to obtain its business by bribing its employees.

16

74. Defendant Rios engaged in the fraudulent racketeering activity by negotiating and executing on Nitel's behalf both the "Independent Sales Representative" agreements with Montalto (who signed on behalf of his company High Mountain) in September 2016, and, a few weeks later, the Service Agreement with Potbelly (also executed on Potbelly's ostensible behalf by Montalto). Rios had direct knowledge that Montalto was acting as a dual agent, and that this fact was being intentionally concealed from Potbelly.

75. These actions by Nitel's top executives were related to and in the course of their employment, were in furtherance of Nitel's business, and were both authorized by and acquiesced in by Nitel itself.

76. Each of Nitel, Grason, Hessmer and Rios intended to engage in the conduct alleged here with express intent to defraud Potbelly through the use of concealed dual agents.

77. It was at all times known to and foreseeable to Nitel, Grason, Hessmer and Rios that interstate wires and/or mails would be used in furtherance of the scheme.

78. As a direct and proximate result of these defendants' false statements and omissions, Potbelly permitted Nitel to supply telecommunications services to dozens of its locations across the country, and permitted Nitel to co-opt the services of Montalto and Buglio. Had Potbelly been aware that Nitel had co-opted the services of those Potbelly employees as Nitel's agents, Potbelly would (a) not have permitted Nitel to provide telecommunications services to any Potbelly facilities, and (b) not have

permitted Montalto and/or Buglio to act as Potbelly's agents with regard to telecommunications services.

79.     As a direct and proximate result of these defendants' fraudulent scheme, Potbelly sustained economic damages in the form of inflated prices for telecommunications services, in the costs associated with transitioning service from Nitel to responsible providers, and in the form of compensation paid to Montalto and Buglio as Potbelly employees when they were in fact acting on behalf of Nitel and for their own personal gain.

## COUNT FIVE

**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030g**
**(Against Montalto and Buglio)**

80.     Plaintiff realleges paragraphs 1 through 45 as though fully set forth herein.

81.     Throughout the period during which Montalto and Buglio were engaged in their scheme to steer Potbelly's business to Nitel in exchange for bribes and kickbacks, they were gaining unauthorized access to Potbelly's computer systems, including hacking into emails of other Potbelly personnel.

82.     Throughout at least 2016 and 2107, Montalto and Buglio intentionally and maliciously and without authorization hacked into the Potbelly email accounts of multiple Potbelly employees and officers, including Potbelly's CEO, its Senior Vice President for Information Technology, and its Senior Vice President for Human Resources. In so doing, Montalto and Buglio accessed confidential information in

violation of Potbelly's policies. Using confidential information obtained in this way, Montalto and Buglio discussed how they could also hack into the *personal* email account of Potbelly's Senior Vice President for Information Technology, and may in fact have done so.

83.     Moreover, in or about July 2018, upon Potbelly's termination of both Montalto and Buglio for the misconduct described in this complaint, Montalto and Buglio worked in concert to intentionally, willfully and knowingly access Potbelly's computer system and cause the transmission of a program, information, code, or command that destroyed data contained on Potbelly's equipment and in Potbelly's computer systems by "wiping" Buglio's Potbelly-issued laptop computer of all data.

84.     Montalto's and Buglio's acts of wiping clean Potbelly's computer, and deleting data, were taken without authorization and contrary to Potbelly's interests.

85.     Montalto's and Buglio's acts of wiping clean Potbelly's computer, and deleting data, were intended to deprive Potbelly of important data, including data needed by Potbelly to assess the actions of Montalto and Buglio in order to pursue the present action.

86.     Montalto, at or before the time of his termination, intentionally, willfully and knowingly accessed Potbelly's computer system and caused the transmission of a program, information, code, or command that blocked Potbelly's access to the data contained on Potbelly's equipment and in Potbelly's computer systems by privately password-protecting Montalto's Potbelly-issued laptop computer and all of its data.

87.     Montalto's acts in blocking Potbelly's access to the data contained on Potbelly's computer equipment were taken without authorization and contrary to Potbelly's interests, and in direct violation of Potbelly's policies.

88.     Montalto's acts in blocking Potbelly's access to the data contained on Potbelly's computer equipment were intended to deprive Potbelly of important data, including data needed by Potbelly to assess the actions of Montalto and Buglio in order to pursue the present action.

89.     Montalto's and Buglio's acts of accessing, destroying and hindering access to Potbelly's data, without authorization, constitute violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*

90.     Potbelly has suffered damages and/or loss as a result of Montalto's and Buglio's destruction of Potbelly's data in an amount yet to be determined, but exceeding five thousand dollars.

## COUNT SIX

### CIVIL CONSPIRACY
### (Against Nitel, Grason, Rios, Hessmer, Montalto, Buglio, High Mountain and Techcule)

91.     Potbelly realleges paragraphs 1 through 45 as though fully set forth herein.

92.     Each of Nitel, Grason, Rios, Hessmer, Montalto, Buglio, High Mountain and Techcule, through the actions described herein, formed an agreement to corrupt and compromise the loyalties that Montalto and Buglio owed to Potbelly, whereby

Montalto and Buglio would exercise their employment responsibilities for the benefit of the defendants.

93.     Each of Nitel, Grason, Rios, Hessmer, Montalto, Buglio, High Mountain and Techcule performed overt acts in furtherance of that agreement, including the award of Potbelly telecommunications work to Nitel, the execution of so-called "Independent Sales Representative" agreements between ostensible Potbelly agents and those acting on behalf of Nitel, the affirmative steps to conceal the existence of the relationship between Montalto and Buglio on the one hand and Nitel on the other, and the payments by Nitel to Montalto and Buglio and/or their companies.

94.     This agreement and the acts taken in furtherance of it accomplished the unlawful purpose of fraudulently depriving Potbelly of the benefit of the fiduciary duties of loyalty owed to it by its agents.

95.     Potbelly suffered injury as a direct and proximate result of these defendants' civil conspiracy, including but not limited to paying above-market rates for telecommunications services, and paying compensation for Montalto's and Buglio's services.

## COUNT SEVEN

### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### (Against Nitel, Grason, Rios and Hessmer)

96.     Potbelly realleges paragraphs 1 through 45 and 56 through 63 as though fully set forth herein.

97.     The acts of Nitel, Grason, Rios and Hessmer in corrupting the loyalties of Potbelly's agents, benefiting from the non-competitive award of telecommunications services, and concealing the arrangement from Potbelly constitute deceptive acts and practices.

98.     These defendants intended that Potbelly would rely on their deception, as evidenced by them taking affirmative steps to conceal from Potbelly that Montalto and Buglio, who were ostensibly Potbelly's agents, were in fact acting as the agents of Nitel.

99.     These defendants' deceptions occurred in the course of conduct involving trade or commerce, particularly the offering and provision of telecommunications services.

100.     A person who suffers damage as a result of practices constituting violations of the Illinois Consumer Fraud and Deceptive Business Practices Act may bring an action against the persons who commit the violations under 815 ILCS 505/10a.

101.     Potbelly has suffered actual damages as a result of these defendants' deceptive trade practices, including the payment of non-competitive rates for telecommunications services, and being deprived of the honest services of its agents.

102.     In accordance with 815 ILCS 505/10a(d), plaintiff is, at the time of the filing of this action, providing a copy of this complaint to the Attorney General of the State of Illinois.

## COUNT EIGHT

### UNJUST ENRICHMENT
### (Against Hessmer)

103.    Potbelly realleges paragraphs 1 through 45 as though fully set forth herein.

104.    Hessmer, as compensation from Nitel for arranging and overseeing the scheme whereby Nitel would secretly pay kickbacks to Montalto, Buglio and/or their companies, received a percentage of every dollar paid by Potbelly for telecommunications services, for which Potbelly paid non-competitive above-market rates.

105.    As a result, Hessmer has retained benefits to Potbelly's detriment, and his retention of those benefits violates fundamental principles of justice, equity and good conscience.

## COUNT NINE

### FRAUDULENT INDUCEMENT
### (Against Nitel)

106.    Potbelly realleges paragraphs 1 through 45 and paragraphs 56 through 63 as though fully set forth herein.

107.    Nitel, in concealing the fact that it had corrupted the loyalties of Montalto and Buglio, and that Montalto, Buglio and/or their companies stood to benefit monetarily from Potbelly's award of business to Nitel, omitted to state and affirmatively concealed material facts from Potbelly.

108. Nitel was aware of the fact that it had corrupted the loyalties of Montalto and Buglio, and concealed that fact to induce Potbelly to permit Nitel to obtain and keep Potbelly's business as a telecommunications provider.

109. The fact of Montalto's and Buglio's corrupted loyalties, and the fact that they would gain monetarily from the award of Potbelly's business to Nitel, was material, in that if Potbelly had been aware that the person or persons responsible for selecting providers was being paid by Nitel, it would have not permitted the entry into a contract with Nitel.

110. Potbelly reasonably relied on its understanding that Montalto and Buglio, in selecting and awarding work to a telecommunications provider, was acting solely in the interests of Potbelly, and not in the interests of Nitel or themselves or their companies.

111. Potbelly was damaged by its reasonable reliance on its understanding that its agents were acting in the interests of their principal, Potbelly, including in the form of non-competitive terms for the provision of telecommunications services.

## COUNT TEN

### DECLARATION THAT POTBELLY-NITEL CONTRACTS ARE VOID

112. Potbelly realleges paragraphs 1 through 45 as though fully set forth herein.

113. Both the Service Agreement and the Service Order Forms by which Nitel has furnished telecommunications services to Potbelly were all executed on Potbelly's ostensible behalf by Montalto.

24

114.    The Service Order Forms for the "pipeline" jobs that were terminated by Potbelly upon Potbelly learning of improper "commissions" being paid were also all executed on Potbelly's ostensible behalf by Montalto.

115.    A contract procured under circumstances where one party's agent was also acting as the undisclosed agent of the adverse party is not binding upon the uninformed principal, and is voidable at the option of the uninformed principal.

116.    Montalto, in executing the Service Agreement and Service Order Forms as the ostensible agent of Potbelly, was acting as a dual agent without Potbelly's knowledge or consent.

117.    Potbelly, upon receiving information to suggest that Nitel was paying undisclosed commissions to Montalto, Buglio and/or their companies, promptly notified Nitel that Potbelly would not proceed with Nitel on any "pipeline" orders, and requested that Nitel produce relevant documentation regarding its actions in obtaining the Potbelly contracts and in paying compensation to Montalto, Buglio and/or their companies.

118.    Nitel has not provided any of the information sought by Potbelly.

119.    Nitel has, however, begun billing Potbelly tens of thousands of dollars for what it characterizes as "early termination" fees for the "pipeline" orders that Potbelly announced it would not proceed with upon learning information to suggest the payment of improper "commissions." Nitel is also claiming the right to collect "late" charges on these "early termination" fees that Potbelly has not paid.

120. Potbelly, since learning information to suggest the payment of improper "commissions," has investigated the circumstances of the Nitel-Potbelly relationship, notwithstanding Nitel's refusal to provide requested information regarding those circumstances, and notwithstanding the actions of Montalto and Buglio to hinder Potbelly's investigation (including but not limited to their actions in "wiping" Buglio's Potbelly-issued laptop computer, and Montalto's refusal to provide the passcode to access his Potbelly-issued laptop computer).

121. Also since learning information to suggest the payment of improper "commissions," Potbelly has taken steps to replace Nitel at all Potbelly locations it was serving with alternative, responsible and ethical providers.

122. Potbelly has now replaced Nitel at all Potbelly locations, and has terminated all of Nitel's services.

123. Nitel has taken the position that Potbelly owes early termination fees both for the "pipeline" orders upon which Potbelly declined to proceed, and on the locations where Nitel was providing service until Potbelly's recent termination of those services. Nitel also has taken the position that Potbelly's failure to pay such charges when invoiced results in the accrual of substantial "late" fees. While Nitel subsequently agreed to "remove" certain early termination fees, it is anticipated that Nitel will attempt to bill such charges for "early termination" at the locations where Nitel has been replaced by responsible vendors.

124. Because the Nitel-Potbelly contracts were procured by fraud, are not enforceable against Potbelly, and are voidable, Potbelly does not owe any early

termination-type fees, neither on the "pipeline" orders nor on the locations where Nitel's services have been terminated.

125.    A genuine controversy exists between Potbelly and Nitel, and Potbelly seeks a declaration from this Court that any ostensible Nitel-Potbelly contracts arising from the Service Agreement or Service Order Forms are void.

WHEREFORE, Potbelly seeks a judgment in its favor and against defendants, providing:

a.    Actual damages proximately caused by defendants' breaches of, and inducement of breaches of, fiduciary duties, including disgorgement of all ill-gotten gains and unjust enrichment;

b.    Compensatory and punitive damages arising from defendants' civil conspiracy, their fraudulent acts and omissions, and their violations of the Illinois Consumer Fraud and Deceptive Business Practices Act;

c.    Treble damages, costs and attorneys' fees as provided in 18 U.S.C. § 1964(c);

d.    Compensatory damages as provided in 18 U.S.C. § 1030(g);

e.    The rescission of any contractual relationships between Potbelly and Nitel;

f.    A declaration that all Potbelly-Nitel contracts are void, that Potbelly owes no "early termination" fees or "late" charges on such fees, and that

Nitel owes Potbelly all sums collected pursuant to those contracts less only the fair market value of any benefits provided to Potbelly by Nitel; and

g.      Such other and further relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiff Potbelly demands a trial by jury on all issues so triable.


Dated:  July 9, 2019                             Respectfully submitted,

                                                 POTBELLY SANDWICH WORKS, LLC

                                                 By:     /s/  Matthew D. Tanner
                                                         One of Its Attorneys

Matthew D. Tanner
Peter S. Roeser
**ROESER TANNER & GRAHAM LLC**
2 North Riverside Plaza, Ste. 1850
Chicago, Illinois 60606
312.300.2522
mtanner@rtglaw.com