**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Potbelly Sandwich Works, LLC, | |
| Plaintiff, | |
| v. | Case No. 19C4613 |
| Network Innovations, Inc., an Illinois Corporation d/b/a Nitel, Inc.; Ronald Grason; James Hessmer; Michael Montalto; Anthony Buglio; High Mountain Consulting, Inc., an Illinois Corporation; and Techcule, LLC, an Illinois Limited Liability Company, | Judge Feinerman |
| Defendants. | |

**FIRST AMENDED COMPLAINT**

Plaintiff, Potbelly Sandwich Works, LLC ("Potbelly"), brings this First Amended Complaint against Network Innovations, Inc., an Illinois Corporation d/b/a Nitel, Inc. ("Nitel"), Ronald Grason, James Hessmer, Michael Montalto, Anthony Buglio, High Mountain Consulting, Inc., ("High Mountain"), and Techcule, LLC, ("Techcule") and alleges the following:

## SUMMARY

1.       This case arises out of a bribery and kickback scheme devised and perpetrated by Nitel and the remaining defendants against Potbelly.

2.       Nitel bribed Potbelly employees, Defendants Michael Montalto and Anthony Buglio, into steering Potbelly business to Nitel. Under the scheme, Nitel secretly agreed to make kickback payments to Montalto and Buglio for any Potbelly business they directed to Nitel. The more business provided, the larger the kickback payment. Within weeks of finalizing the kickback scheme in writing, Montalto and Buglio started delivering the Potbelly business.

3.       The defendants concealed the scheme for years, reaping hundreds of thousands of dollars from Potbelly in the process and fraudulently obtaining Potbelly service orders for more than 70 shop locations throughout the country.

4.       Nitel's actions are part of a concerted effort by its executive leadership team to defraud Potbelly and reaches the highest ranks in the company, including its President (Defendant Ronald Grason), senior sales executive (Defendant James Hessmer), and others. The defendants have engaged in civil conspiracy, breached and induced the breach of fiduciary duties, committed fraud, fraudulently induced Potbelly into a contract and violated various state and federal laws including the Civil RICO statute, the Computer Fraud and Abuse Act, and the Illinois Consumer Fraud and Deceptive Practices Act. In addition to seeking damages, Potbelly seeks a declaratory judgment that the Potbelly-Nitel contracts are void.

## PARTIES

5.      Plaintiff Potbelly is an Illinois Limited Liability Company whose sole member is Potbelly Illinois, Inc., an Illinois corporation with its principal place of business in Illinois, which is itself a wholly owned subsidiary of Potbelly Corporation, a Delaware corporation with its principal place of business in Illinois. Potbelly operates, through subsidiary entities, more than 430 sandwich shops throughout the United States.

6.      Defendant Nitel has its principal place of business in Chicago, Illinois. Nitel holds itself out as a provider of telecommunications services.

7.      Defendant Ronald Grason, a citizen of Illinois, is and at all relevant times has been the President of Nitel.

8.      Defendant James Hessmer, a citizen of Illinois, is and at all relevant times has been a senior sales executive for Nitel.

9.      Defendant Michael Montalto, a citizen of Illinois, was the Senior Director of Information Technology for Potbelly until his termination on July 20, 2018.

10.     Defendant Anthony Buglio, a citizen of Illinois, was a Manager, Infrastructure and Networking for Potbelly until his termination on July 20, 2018.

11.     Defendant High Mountain Consulting, Inc. ("High Mountain") is an Illinois corporation with its principal place of business in Illinois. High Mountain was created by Montalto for the purpose of receiving Montalto's kickback payments from Nitel.

12.     Defendant Techcule, LLC is an Illinois limited liability corporation created by Buglio for the purpose of receiving Buglio's share of kickback payments from Nitel or derivatively from Montalto or High Mountain.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, in that the action presents questions arising under the laws of the United States, including 18 U.S.C. § 1964(c) (which provides a private cause of action for violations of 18 U.S.C. § 1962(d)) and 18 U.S.C. § 1030(g). Plaintiff's claims under Illinois Law are so related to Plaintiff's claims over which the Court has original jurisdiction that they form part of the same case or controversy, the Court has supplemental jurisdiction over Plaintiff's common law and state-law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that each of the defendants is a resident of Illinois and one or more of them reside within this judicial district, and in that a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## BACKGROUND

### Montalto and Buglio Employment at Potbelly

15.      Potbelly operates approximately 430 company-owned and 40 franchise sandwich shops in 34 states within the United States.

16.     Potbelly sandwich shops utilize telecommunications services both for traditional phone services and for internet data transmission and receipt. These telecommunications are vital for the operation of the sandwich shops both in terms of

their interactions with their customer base (including telephone and on-line ordering) and their interactions with company headquarters in Chicago and vendors (such as reporting of sales, payroll, and ordering functions).

17.     Defendant Montalto was employed in Potbelly's Information Technology department from 2015 until July 2018. Montalto was originally hired as a Director, Infrastructure and Network Operations, and was promoted on March 26, 2018 to the role of Senior Director of Information Technology.

18.     At all relevant times, Montalto's responsibilities within Potbelly included analyzing and providing technological solutions for Potbelly's telecommunications needs, and identifying, evaluating, recommending and overseeing providers of telecommunications services.

19.     Defendant Buglio was employed in Potbelly's Information Technology department from December 2015 until July 2018. Buglio was hired as a Network Engineer and promoted on March 26, 2018 to the role of Manager, Infrastructure and Networking Services. Buglio was subordinate to Montalto.

20.     Immediately before becoming employed by Potbelly, Buglio was employed as a senior network administrator for Nitel.

### Nitel's Kickback Agreements with Montalto and Buglio

21.     Nitel holds itself out as a provider of integrated network and telecommunications services to businesses. Starting no later than 2016, Nitel identified Potbelly and its nationwide shop locations as a strategic target for its services.

22.     Unable to obtain a service agreement for a single Potbelly shop, Nitel conspired with Potbelly employees Montalto and Buglio to steer the Potbelly business to Nitel through a kickback scheme.

23.     In September 2016 Nitel and Montalto (through High Mountain) entered into what was captioned as an "Independent Sales Representative Agreement" which recited that Nitel "desires to expand its customer base" and authorized Montalto to "refer and solicit orders" from prospective commercial subscribers (hereinafter the "Montalto-Nitel Agreement"). In consideration, Nitel agreed to kick back a portion of the profits to Montalto in the form of "Commissions." The Montalto-Nitel Agreement, signed by Montalto on behalf of High Mountain and by Nitel, is attached hereto as Exhibit 1.

24.     Nitel and Buglio (through Techcule) entered into a substantially identical "Independent Sales Representative Agreement" in late 2016 (when Buglio signed it on behalf of Techcule) or early 2017 (when it was countersigned by Nitel). The Buglio-Nitel Agreement, signed by Buglio on behalf of Techcule and by Nitel, is attached hereto as Exhibit 2.

25.     With the kickback scheme in place, Montalto and Buglio began a concerted effort to award a Potbelly contract for telecommunications services to Nitel.

26.     Less than four weeks after Montalto and Nitel executed the Montalto-Nitel Agreement, Montalto (ostensibly acting on behalf of Potbelly) and Nitel executed the first-ever "Service Agreement" between the two companies (the "Potbelly-Nitel Services Agreement"). Pursuant to the Potbelly-Nitel Services Agreement, Nitel would

issue a "Service Order Form" for each Potbelly store location and Potbelly would execute the form indicating its purported acceptance. The Potbelly-Nitel Service Agreement is attached hereto as Exhibit 3. An example of an executed "Service Order Form" is attached hereto as Exhibit 4.

27. Montalto immediately began executing "Service Order Forms" pursuant to which Potbelly ostensibly awarded telecommunication service work to Nitel. Through the kickback scheme Nitel expanded its business with Potbelly from no shop locations in 2016 to more than 70 locations throughout the country by July 2018, a number that would have continued to increase had Potbelly not discovered information relating to the scheme.

28. In addition, defendants used the scheme to charge Potbelly and others inflated, above-market rates for their services, overcharging by 100 percent or more.

29. Since the Potbelly-Nitel Service Agreement was entered into, Potbelly has paid hundreds of thousands of dollars to Nitel, which has in turn paid tens of thousands of dollars in kickbacks, in the form of "Commissions," to High Mountain for the benefit of Montalto and Buglio.

**Defendants Conceal the Scheme**

30. The arrangement whereby Montalto and Buglio would act in the interests of themselves and Nitel, while appearing to be acting solely on behalf of Potbelly, was devised and overseen by the highest-level executives at Nitel.

31. Defendant Grason (Nitel's President) repeatedly interacted directly with Montalto in furtherance of the kickback scheme and was personally involved in the

allocation of kickback payments among Montalto and Buglio. Grason provided explicit instructions to his subordinates regarding "check cutting" for the payment of "commissions" (kickbacks) for the benefit of Montalto and Buglio.

32.     On January 27, 2017, Montalto wrote to Grason, specifically identifying both the "Potbelly Account" and High Mountain, and providing "my company information" including taxpayer ID number, and inquiring whether other information was needed to "ensure . . . that my commissions earnings [sic] will be paid correctly?"

33.     On the same day, January 27, 2017, Grason informed Nitel's Vice President of Accounting Operations in writing that on Potbelly business, Nitel should "split" the kickback payments between High Mountain (Montalto's company) and Techcule (Buglio's company), with a total 15 percent payment being apportioned 12 percent to High Mountain and 3 percent to Techcule. To effectuate these payments, however, Grason had to circumvent Nitel's accounting software which prohibited the split of so-called "commissions."  Therefore, Grason instructed Nitel's Vice President of Accounting Operations to issue separate checks.

34.     Later on or about that same day, Grason specifically instructed Nitel's Commission Analyst, who was responsible for tabulating and disbursing "commissions" to agents that for Potbelly business, that checks for the entire 15 percent were to be "cut directly" to High Mountain.

35.     In accordance with Grason's instructions, "commission" checks for all Potbelly business were issued payable to Montalto's High Mountain, and Montalto in turn paid a portion to Buglio or his company Techcule.

36.     Defendants were each aware of the need to conceal this arrangement from Potbelly and successfully did so for years.

37.     Nitel, in an effort to conceal the scheme from Potbelly, arranged for the Nitel Service Order Forms for Potbelly to misrepresent the standard identification of the sales "agent," so that Potbelly would not discover that its own employee Montalto—who was negotiating and administering the Potbelly-Nitel relationship on behalf of Potbelly—was acting as an agent for Nitel.

38.     Instead, Nitel misrepresented on the portion of the "Service Order Forms" where an "agent" was to be listed, that there was no agent, in some instances writing "no" agent and in others leaving it blank. *See* Ex. 4.

39.     This misrepresentation of the "agent" information on Nitel's invoices to Potbelly was done at the oral and written direction on July 11, 2017 of defendant Hessmer to Nitel's Commissions Analyst, with the express intent that Potbelly not learn of the arrangement with Montalto.

40.     Hessmer directed others at Nitel to misrepresent the agent information on all external documents with Potbelly because the "deal may detonate" if the people at Potbelly ever found out their employee had "a vested interest" in directing the business to Nitel. Hessmer instructed, however, that the "agent" information be correctly listed on all internal Nitel documents.

41.     Montalto and Buglio were equal participants in misrepresenting and concealing this arrangement, never once disclosing its existence to Potbelly despite a fiduciary duty to do so, and later destroying records to cover it up.

## Termination of Montalto and Buglio

42.     Upon discovering and investigating information related to the scheme in July 2018, Potbelly terminated the employment of Montalto and Buglio, and notified Nitel of Potbelly's discovery that Nitel had been issuing "commission" payments to High Mountain and/or Techcule in connection with the Potbelly-Nitel telecommunications business. Potbelly demanded from Nitel an accounting of amounts paid pursuant to this arrangement, and demanded that all such payments cease. Nitel complied with none of these demands (and has continued to this day paying High Mountain a percentage of Nitel's Potbelly billings) and has failed to confirm or deny the existence or terms of its arrangements with Montalto, Buglio and/or their companies.

43.     Also upon learning of information related to the scheme, Potbelly began taking steps to terminate then-existing plans for Nitel to provide services to additional Potbelly sandwich shop locations (as had been in the "pipeline" before the scheme was discovered), and to provide for the orderly transition of all Potbelly locations already being serviced by Nitel to alternative, responsible and ethical providers.

44.     In furtherance of their fraudulent scheme to obtain personal financial benefits at Potbelly's expense, Buglio and Montalto each used their Potbelly-provided laptop computers to access company information which they had no legitimate business purpose for accessing, and which exceeded their authorizations from Potbelly.

45.     Buglio and Montalto wrongfully and without authorization circumvented Potbelly's security systems, and also "hacked" (made authorized access to, reviewed and captured the substance of email communications within) the Potbelly email

accounts of several Potbelly senior officers, in part to further their fraudulent scheme to drive business to Nitel.

46.     Immediately after Buglio's and Montalto's terminations, Buglio and Montalto, acting in concert and without authorization, remotely "wiped" Buglio's Potbelly-issued laptop computer in order to hinder Potbelly's investigation into his and Montalto's wrongdoing, thus removing all data previously existing on that computer.

47.     Prior to or at the time of Montalto's termination, Montalto installed a code or software on his Potbelly-issued laptop computer in order to prevent access to that computer without a password that was not made known to Potbelly. Montalto's actions were taken without authorization and in direct contravention of Potbelly policies and procedures, and circumvented Potbelly's internal programs and procedures for company-issued computer access and security. Following Montalto's termination, he refused to provide the password to Potbelly.

## COUNT ONE

### BREACH OF FIDUCIARY DUTY
### (Against Montalto and Buglio)

48.      Plaintiff incorporates paragraphs 1 through 47 as though fully set forth herein.

49.     Agents, including employees, owe fiduciary duties of loyalty to their principal/employer not to exploit their positions within the company for their own personal benefit.

50.     Montalto and Buglio owed those duties not only pursuant to the law of agency, but also because they both acknowledged and agreed to be bound by the policies contained in Potbelly's Employee Handbook and Ethics Code of Conduct, including policies against accepting money from vendors. Each of Montalto and Buglio acknowledged receiving and reviewing these policies before they participated in the scheme to steer Potbelly's business to Nitel in exchange for money.

51.     Montalto and Buglio both had positions as agents for Potbelly charged with acting for the benefit of Potbelly. By accepting money from Nitel in return for steering Potbelly's business to Nitel, Montalto and Buglio breached their fiduciary duties of loyalty.

52.     As a direct and proximate result of Montalto's and Buglio's breaches of their fiduciary duties of loyalty, Potbelly suffered injuries including but not limited to paying above-market rates for telecommunications services, and paying compensation for Montalto's and Buglio's services.

## COUNT TWO

### INDUCEMENT OF BREACH OF FIDCIARY DUTY

### (Against Nitel, Grason and Hessmer)

53.     Plaintiff incorporates paragraphs 1 through 52 as though fully set forth herein.

54.     A third party who colludes with a fiduciary in committing a breach of duty, or induces or participates in such a breach, and obtains benefits therefrom is directly liable to the aggrieved party.

55.     Each of defendants Nitel, Grason and Hessmer colluded with, and induced or participated with, Montalto and Buglio in committing their breaches of their fiduciary duties.

56.     Each of defendants Nitel, Grason and Hessmer obtained benefits from the breaches of fiduciary duties committed by Montalto and Buglio. These defendants obtained the benefit of wrongfully obtained business that they would not have otherwise received, including through the charging of above-market rates for services provided. In addition, defendant Hessmer was directly compensated for the Potbelly business as a result of those breaches.

## COUNT THREE

**CIVIL RICO CONSPIRACY—VIOLATION OF 18 U.S.C. § 1962(d)**
**(Against Grason, Hessmer, Montalto and Buglio)**

57.     Plaintiff realleges paragraphs 1 through 56  as though fully set forth herein.

58.     Through their actions Grason, Hessmer, Montalto and Buglio violated or conspired to violate 18 U.S.C. § 1962(c), which states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

59.     Grason, Hessmer, Montalto and Buglio conspired to defraud Potbelly and carried out that agreement, as detailed herein. Accordingly, the RICO claim is brought

against them pursuant to 18 U.S.C. § 1962(d), for conspiring to violate 18 U.S.C. § 1962(c).

60.     Nitel is a corporation which affects interstate commerce, and as such, it is a RICO "enterprise" within the meaning of 18 U.S.C. § 1961(4). In addition to the specific use of the mails and interstate wires to accomplish its scheme as outlined below, Nitel provides telecommunications services throughout the United States and, as a result of the scheme alleged herein, provided such services to Potbelly locations in at least 13 states.

61.     Grason, Hessmer, Montalto and Buglio are all culpable "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

62.     Grason, Hessmer, Montalto and Buglio used and caused to be used the United States mail in furtherance of their scheme. For example:

A.      On or about April 1, 2017, defendants mailed or caused to be mailed, from Nitel, Inc., 350 N. Orleans St., Chicago, Illinois to Potbelly Corporation, c/o Ecova, PO Box 2450, Spokane, Washington, via the U.S. mail, an invoice for $6,350 for telecommunications services provided to 11 Potbelly locations in seven states.

B.      On or about May 1, 2017, defendants mailed or caused to be mailed, from NiTel, Inc., 350 N. Orleans St., Chicago, Illinois to Potbelly Corporation, c/o Ecova, PO Box 2450, Spokane, Washington, via the U.S. mail, an invoice for $4,335 for telecommunications services provided to 12 Potbelly locations in seven states.

63.     Defendants mailed or caused to be mailed, in the same fashion and to the same Spokane address, invoices for services provided to multiple locations in multiple states on or about the first day of each month from April 1, 2017 through at least April

1, 2019, with the services provided eventually reaching more than 70 locations in at least 13 states. Those invoices totaled hundreds of thousands of dollars. Potbelly paid for all of the services billed in full.

64.    Grason, Hessmer, Montalto and Buglio used Nitel to carry out their scheme to enrich it and themselves, at Potbelly's expense.

65.    The amounts billed to, and paid by, Potbelly were approximately double the amounts Potbelly would have paid for the needed telecommunications services had those services been contracted for in arms-length transactions.

66.    This scheme constitutes a "pattern" of racketeering activity pursuant to 18 U.S.C. §§ 1961(1)(B) and (5), which began in 2017 (based on a scheme put into place no later than September 2016) and continued through at least April 2019.

67.    Grason, Hessmer, Montalto and Buglio violated 18 U.S.C. § 1962(d) by conspiring to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity as further described herein.

68.    Since the execution of the Montalto-Nitel Agreement in September 2016, Grason, Hessmer, Montalto and Buglio have overseen and conducted a pattern of racketeering affecting interstate commerce, including by at least the following:

    A.    entering into the Service Agreement executed on ostensible behalf of Potbelly by Montalto, despite these defendants' knowledge that Montalto was being paid by Nitel to act as the agent of Nitel;

    B.    entering into dozens of Service Order Forms (each awarding Nitel the right to provide telecommunications services to a different Potbelly location at above-market prices) throughout at least 2017 and 2018, also executed on ostensible behalf of Potbelly by Montalto;

15

C.      actively and falsely asserting there was no "agent" receiving commissions from Potbelly's business, in some instances by leaving the "agent" section of the paperwork blank, and in others by writing "no" agent; and

D.      issuing dozens of monthly invoices to Potbelly via the U.S. mail throughout 2017, 2018 and 2019, charging above-market rates for business that was obtained, and prices that were arrived at, via the fraudulent relationship with Montalto.

69.     The 25-plus monthly invoices sent via the U.S. mail were in furtherance of the scheme to defraud Potbelly by falsely denying and concealing the existence of an "agent" on the Potbelly account, and by concealing that the "agent" was a Potbelly employee entrusted by Potbelly with selecting telecommunications providers, but who was in fact being paid by Nitel to steer the Potbelly business, for which Potbelly was charged substantially above-market prices, to Nitel.

70.     These mailings furthered these defendants' scheme, and thus violate 18 U.S.C. § 1341, which states:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or knowingly causes to be delivered by mail or such carrier according to the direction thereon . . . shall be fined under this title or imprisoned not more than 20 years, or both.

71.     Both the activity of Nitel generally, and the activity of the enterprise in fact with regard to this racketeering activity, were conducted in and

affect interstate commerce, and involved the provision of telecommunications services to Potbelly locations in at least 13 states.

72.     The racketeering activities identified in paragraph 68 entailed dozens of discrete instances of similar and repetitive behavior spanning at least the 2017-2019 time frame. Each new Service Order Form, and each invoice sent though the U.S. mail, constituted a discrete attempt to defraud Potbelly.

73.     Potbelly is not the only Nitel customer whose telecommunications business Nitel was acquired by secretly agreeing to pay, and paying, the customer's agent purported "Commissions" (*i.e.,* bribes and kickbacks). This is Nitel's practice as to multiple customers.

74.     For example, at least one Potbelly franchisee, Lettuce Feed You 1, LLC ("Lettuce Feed You"), was also charged inflated rates that resulted in undisclosed kickback payments to Montalto/High Mountain in at least 2017 and 2018, making it a distinct victim of these defendants' scheme. Beginning no later than April 2017, Nitel sent invoices each month to Lettuce Feed You via the U.S. mail, and in approximately mid-2018 Nitel began sending the invoices via interstate wires, as email attachments sent from Illinois to Indiana. Nitel then issued 15-percent kickback payments to High Mountain.

75.     In addition, Nitel utilized the same fraudulent pattern to overbill for services to, and pay kickbacks to an employee of, South Bend, Indiana-based Press Ganey, a healthcare-related company. As to this fraudulent activity directed toward Press Ganey, a third party, Potbelly lacks access to specific information with regard to

17

the exact time frame and other details, and intends to uncover such details through the discovery process. Fraudulent invoices were sent to Press Ganey, and payments on those invoices have been made by Press Ganey, over a period of years utilizing the U.S. mail and/or interstate wires.

76. These acts, as they related both to Potbelly and other Nitel customers, are and have been related to one another and continuous throughout at least the 2017-2019 time frame. These acts satisfy the RICO requirement for a closed-ended scheme, and also carry a threat of continuity into the future.

77. Defendant Grason engaged in the fraudulent racketeering activity by meeting and planning the scheme—*i.e.*, the use of an ostensible Potbelly agent to act as Nitel's agent without Potbelly's knowledge—directly with Montalto, both at the time the Nitel-High Mountain agreement was entered into in September 2016 and the time the Nitel-Potbelly Service Agreement was entered into in October 2016, even though Grason's regular duties as President of Nitel do not involve dealing with Nitel's independent sales agents. Grason also specifically directed how the kickbacks were to be paid by Nitel.

78. Defendant Hessmer engaged in the fraudulent racketeering activity by coordinating Potbelly service accounts with Montalto, and by affirmatively instructing Nitel's Sales Commission Analyst to  agent on Service Order Forms for Potbelly accounts, for the express purpose of keeping Potbelly from learning of the scheme to obtain its business by bribing its employees.

79.    Each of Grason, Hessmer, Montalto and Buglio intended to engage in the conduct alleged here with express intent to defraud Potbelly through the use of concealed dual agents, and all of them agreed to carry out the scheme.

80.    Had the information that was misrepresented and concealed been disclosed or otherwise made known to Potbelly, Potbelly would not have contracted with Nitel (or would have terminated its relationship with Nitel, as it eventually did), and would not have permitted Montalto or Buglio to be involved in choosing telecommunications providers (or would have terminated their employment, as it did when it learned of the scheme).

81.    It was at all times known to and foreseeable to Grason, Hessmer, Montalto and Buglio that interstate wires and/or mails would be used in furtherance of the scheme.

82.    As a direct and proximate result of, and by reason of, this pattern of racketeering, Plaintiff has been injured in its business or property, within the meaning of 18 U.S.C. § 1964(c). Potbelly sustained economic damages in the form of significantly inflated prices for telecommunications services, in the costs associated with investigating and transitioning service from Nitel to responsible providers, and in the form of compensation paid to Montalto and Buglio as Potbelly employees when they were in fact acting on behalf of Nitel and for their own personal gain.

## COUNT FOUR

### FRAUD
### (Against Nitel, Grason, Hessmer, Montalto and Buglio)

83.     Plaintiff realleges paragraphs 1 through 82 as though fully set forth herein.

84.     At all relevant times, each of Nitel, Grason, Hessmer, Montalto and Buglio knew that Montalto and Buglio were acting not solely in the interests of Potbelly, but in the interests of each of the defendants.

85.     At all relevant times, each of the defendants was aware that Montalto and Buglio stood to receive, and were receiving, compensation from Nitel for steering Potbelly's business to Nitel.

86.     At no time did any of the defendants disclose to Potbelly that Montalto and Buglio stood to receive, or were receiving, compensation from Nitel for steering Potbelly's business to Nitel.

87.     Defendants took affirmative steps to prevent Potbelly's discovery of the fact that Montalto and Buglio were acting as agents of Nitel, including by ensuring that Service Order Forms misrepresented the fact that there were "agents" (i.e., Montalto, Buglio and/or their companies) on the account.

88.     The decision to misrepresent the "agent" information from Potbelly Service Order Forms was done at the express direction of defendant Hessmer communicated to Nitel's Sales Commission Analyst on or about July 11, 2017, for the stated purpose of preventing Potbelly from learning that one or more of its own employees was personally benefitting from steering work to Nitel, and with the express

realization that if Potbelly learned of the arrangement, it would lead to termination of any Potbelly-Nitel relationship.

89. The information that defendants worked to conceal from Potbelly was material, and had it been learned earlier would have led to the avoidance or termination of any Potbelly-Nitel relationship.

90. Potbelly reasonably relied upon its understanding that its employees were acting as its agents and in its interests, in accordance with the standards contained in the Potbelly Employee Handbook and Ethics Code of Conduct, and not for their own self-enrichment or the undue enrichment of third parties.

91. As a direct and proximate result of defendants' fraudulent acts and omissions, Potbelly suffered damages to be proved at trial, including the inflated costs of the services provided by Nitel, and the costs associated with replacing Nitel with a responsible vendor.

## <u>COUNT FIVE</u>

### **VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030g (Against Montalto and Buglio)**

92. Plaintiff realleges paragraphs 1 through 91 as though fully set forth herein.

93. Throughout the period during which Montalto and Buglio were engaged in their scheme to steer Potbelly's business to Nitel in exchange for bribes and kickbacks, they were gaining unauthorized access to Potbelly's computer systems, including hacking into emails of other Potbelly personnel.

94.     After terminating Montalto and Buglio in July 2018, Potbelly discovered that throughout at least 2016 and 2107, Montalto and Buglio intentionally and maliciously and without authorization accessed the Potbelly email accounts of multiple Potbelly employees and officers, including Potbelly's CEO, its Senior Vice President for Information Technology, and its Senior Vice President for Human Resources, and reviewed and captured the substance of email communications to and from those employees and officers. Indeed, in August 2017, Montalto and Buglio secretly discussed the best method to break into the ***personal*** email account of Potbelly's Senior Vice President for Information and Technology.  In so doing, Montalto and Buglio accessed confidential information in violation of Potbelly's policies.

95.     Moreover, in or about July 2018, upon Potbelly's termination of both Montalto and Buglio for the misconduct described in this complaint, Montalto and Buglio worked in concert to intentionally, willfully and knowingly access Potbelly's computer system and cause the transmission of a program, information, code, or command that destroyed data contained on Potbelly's equipment and in Potbelly's computer systems by "wiping" Buglio's Potbelly-issued laptop computer of all data.

96.     Shortly after destroying the data on the computer issued to Buglio, Buglio confirmed in writing to Montalto that the act was complete.

97.     Montalto's and Buglio's acts of wiping clean Potbelly's computer, and deleting data, were taken without authorization and contrary to Potbelly's interests.

98.     Montalto's and Buglio's acts of wiping clean Potbelly's computer, and deleting data, were intended to deprive Potbelly of important data, including data

22

needed by Potbelly to assess the actions of Montalto and Buglio in order to pursue the present action.

99.     Montalto, at or before the time of his termination, intentionally, willfully and knowingly accessed Potbelly's computer system and caused the transmission of a program, information, code, or command that blocked Potbelly's access to the data contained on Potbelly's equipment and in Potbelly's computer systems by privately password-protecting Montalto's Potbelly-issued laptop computer and all of its data.

100.     Montalto's acts in blocking Potbelly's access to the data contained on Potbelly's computer equipment were taken without authorization and contrary to Potbelly's interests, and in direct violation of Potbelly's policies.

101.     Montalto's acts in blocking Potbelly's access to the data contained on Potbelly's computer equipment were intended to deprive Potbelly of important data, including data needed by Potbelly to assess the actions of Montalto and Buglio in order to pursue the present action.

102.     Montalto's and Buglio's acts of accessing, destroying and hindering access to Potbelly's data, without authorization, constitute violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*

103.     Potbelly has suffered damages and loss. In addition to being denied access to its own data by these defendants, Potbelly also suffered loss in excess of $5,000. In particular, as a result of these acts of Montalto and Buglio, Potbelly reasonably incurred more than $5,000 in expenses within a one-year period in responding to the offense, including conducting a damage assessment and restoring data.

## COUNT SIX

### CIVIL CONSPIRACY
### (Against Nitel, Grason, Hessmer, Montalto, Buglio, High Mountain and Techcule)

104.     Potbelly realleges paragraphs 1 through 103 as though fully set forth herein.

105.     Each of Nitel, Grason, Hessmer, Montalto, Buglio, High Mountain and Techcule, through the actions described herein, formed an agreement to corrupt and compromise the loyalties that Montalto and Buglio owed to Potbelly and to defraud Potbelly, whereby Montalto and Buglio would exercise their employment responsibilities for the benefit of the defendants and to the detriment of Potbelly.

106.     Each of Nitel, Grason, Hessmer, Montalto, Buglio, High Mountain and Techcule performed overt acts in furtherance of that agreement, including the award of Potbelly telecommunications work to Nitel, the execution of so-called "Independent Sales Representative" agreements between ostensible Potbelly agents and Nitel, the affirmative steps to conceal the existence of the relationship between Montalto and Buglio on the one hand and Nitel on the other, and the payments by Nitel to Montalto's company for the benefit of Montalto and Buglio.

107.     This agreement and the acts taken in furtherance of it accomplished the unlawful purpose of fraudulently depriving Potbelly of the benefit of the fiduciary duties of loyalty owed to it by its agents.

108.     Potbelly suffered injury as a direct and proximate result of these defendants' civil conspiracy, including but not limited to paying above-market rates for

telecommunications services, and paying compensation for Montalto's and Buglio's services.

## COUNT SEVEN

**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
(Against Nitel, Grason and Hessmer)**

109.    Potbelly realleges paragraphs 1 through 108 as though fully set forth herein.

110.    The acts of Nitel, Grason and Hessmer in corrupting the loyalties of Potbelly's agents, benefiting from the non-competitive award of telecommunications services, and concealing the arrangement from Potbelly constitute deceptive acts and practices.

111.    These defendants intended that Potbelly would rely on their deception, as evidenced by them taking affirmative steps to conceal from Potbelly that Montalto and Buglio, who were ostensibly Potbelly's agents, were in fact acting as the agents of Nitel.

112.    These defendants' deceptions occurred in the course of conduct involving trade or commerce, particularly the offering and provision of telecommunications services.

113.    These defendants' deceptions injured not only Potbelly but other customers as well, including but not limited to those named above; these actions constitute deceptive practices toward the telecommunications market generally, and implicate consumer protection concerns.

114.    A person who suffers damage as a result of practices constituting violations of the Illinois Consumer Fraud and Deceptive Business Practices Act may bring an action against the persons who commit the violations under 815 ILCS 505/10a.

115.    Potbelly has suffered actual damages as a result of these defendants' deceptive trade practices, including the payment of non-competitive rates for telecommunications services, and being deprived of the honest services of its agents.

116.    In accordance with 815 ILCS 505/10a(d), plaintiff, at the time of the filing of this action, provided a copy of the complaint to the Attorney General of the State of Illinois.

## COUNT EIGHT

### UNJUST ENRICHMENT
### (Against Hessmer)

117.    Potbelly realleges paragraphs 1 through 116 as though fully set forth herein.

118.    Hessmer, as compensation from Nitel for arranging and overseeing the scheme whereby Nitel would secretly pay kickbacks for the benefit of Montalto and Buglio, received direct additional payments from Nitel for the Potbelly telecommunications business, for which Potbelly paid non-competitive, significantly above-market rates.

119.    As a result, Hessmer has retained benefits to Potbelly's detriment, and his retention of those benefits violates fundamental principles of justice, equity and good conscience.

## COUNT NINE

### FRAUDULENT INDUCEMENT
### (Against Nitel)

120.    Potbelly realleges paragraphs 1 through 119 as though fully set forth herein.

121.    Nitel, in concealing the fact that it had corrupted the loyalties of Montalto and Buglio, and that Montalto and Buglio stood to benefit monetarily from Potbelly's award of business to Nitel, omitted to state and affirmatively concealed material facts from Potbelly.

122.    Nitel was aware of the fact that it had corrupted the loyalties of Montalto and Buglio, and affirmatively misrepresented and concealed that fact to induce Potbelly to permit Nitel to obtain and keep Potbelly's business as a telecommunications provider charging inflated rates.

123.    The fact of Montalto's and Buglio's corrupted loyalties, and the fact that they would gain monetarily from the award of Potbelly's business to Nitel, was material, in that if Potbelly had been aware that the person or persons responsible for selecting providers was being paid by Nitel, it would have not permitted the entry into a contract with Nitel.

124.    Potbelly reasonably relied on its understanding that Montalto and Buglio, in selecting and awarding work to a telecommunications provider, was acting solely in the interests of Potbelly, and not in the interests of Nitel or themselves or their companies.

125.    Potbelly was damaged by its reasonable reliance on its understanding that its agents were acting in the interests of their principal, Potbelly, including in the form of non-competitive terms for the provision of telecommunications services.

## COUNT TEN

### DECLARATION THAT POTBELLY-NITEL CONTRACTS ARE VOID

126.    Potbelly realleges paragraphs 1 through 125 as though fully set forth herein.

127.    Both the Service Agreement and the Service Order Forms by which Nitel has furnished telecommunications services to Potbelly were all executed on Potbelly's ostensible behalf by Montalto.

128.    The Service Order Forms for the "pipeline" jobs that were terminated by Potbelly upon Potbelly learning of improper "commissions" being paid were also all executed on Potbelly's ostensible behalf by Montalto.

129.    A contract procured under circumstances where one party's agent was also acting as the undisclosed agent of the adverse party is not binding upon the uninformed principal, and is voidable at the option of the uninformed principal.

130.    Montalto, in executing the Service Agreement and Service Order Forms as the ostensible agent of Potbelly, was acting as a dual agent without Potbelly's knowledge or consent.

131.    Potbelly, upon receiving information to suggest that Nitel was paying undisclosed commissions to Montalto and Buglio, promptly notified Nitel that Potbelly would not proceed with Nitel on any "pipeline" orders, and requested that Nitel

produce relevant documentation regarding its actions in obtaining the Potbelly

contracts and in paying compensation for the benefit of Montalto and Buglio.

132.    Nitel has not provided any of the information sought by Potbelly.

133.    Nitel has, however, begun billing Potbelly tens of thousands of dollars for

what it characterizes as "early termination" fees for the "pipeline" orders that Potbelly

announced it would not proceed with upon learning information to suggest the

payment of improper "commissions." Nitel is also claiming the right to collect "late"

charges on these "early termination" fees that Potbelly has not paid.

134.    Potbelly, since learning information to suggest the payment of improper

"commissions," has investigated the circumstances of the Nitel-Potbelly relationship,

notwithstanding Nitel's refusal to provide requested information regarding those

circumstances, and notwithstanding the actions of Montalto and Buglio to hinder

Potbelly's investigation (including but not limited to their actions in "wiping" Buglio's

Potbelly-issued laptop computer, and Montalto's refusal to provide the passcode to

access his Potbelly-issued laptop computer).

135.    Also since learning information to suggest the payment of improper

"commissions," Potbelly has taken steps to replace Nitel at all Potbelly locations it was

serving with alternative, responsible and ethical providers.

136.    Potbelly has now replaced Nitel at all Potbelly locations, and has

terminated all of Nitel's services.

137.    Nitel has taken the position that Potbelly owes early termination fees both

for the "pipeline" orders upon which Potbelly declined to proceed, and on the locations

where Nitel was providing service until Potbelly's recent termination of those services. Nitel also has taken the position that Potbelly's failure to pay such charges when invoiced results in the accrual of substantial "late" fees. While Nitel subsequently agreed to "remove" certain early termination fees, it is anticipated that Nitel will attempt to bill such charges for "early termination" at the locations where Nitel has been replaced by responsible vendors.

138.    As recently as July 2019, Nitel claimed entitlement to hundreds of thousands of dollars in early termination fees under the contract from Potbelly. Potbelly disputes that claim.

139.    Because the Nitel-Potbelly contracts were procured by fraud, are not enforceable against Potbelly, and are voidable, Potbelly does not owe any early termination-type fees, neither on the "pipeline" orders nor on the locations where Nitel's services have been terminated.

140.    A genuine controversy exists between Potbelly and Nitel, and Potbelly seeks a declaration from this Court that any ostensible Nitel-Potbelly contracts arising from the Service Agreement or Service Order Forms are void.

**WHEREFORE**, Potbelly seeks a judgment in its favor and against defendants, providing:

a.    Actual damages proximately caused by defendants' breaches of, and inducement of breaches of, fiduciary duties, including disgorgement of all ill-gotten gains and unjust enrichment;

b.      Compensatory and punitive damages arising from defendants' civil conspiracy, their fraudulent acts and omissions, and their violations of the Illinois Consumer Fraud and Deceptive Business Practices Act;

c.      Treble damages, costs and attorneys' fees as provided in 18 U.S.C. § 1964(c);

d.      Compensatory damages as provided in 18 U.S.C. § 1030(g);

e.      The rescission of any contractual relationships between Potbelly and Nitel;

f.      A declaration that all Potbelly-Nitel contracts are void, that Potbelly owes no "early termination" fees or "late" charges on such fees, and that Nitel owes Potbelly all sums collected pursuant to those contracts less only the fair market value of any benefits provided to Potbelly by Nitel; and

g.      Such other and further relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiff Potbelly demands a trial by jury on all issues so triable.

Dated:  September 25, 2019                    Respectfully submitted,

POTBELLY SANDWICH WORKS, LLC

By:      /s/  Matthew D. Tanner
          One of Its Attorneys

Matthew D. Tanner | Peter S. Roeser
**ROESER TANNER & GRAHAM LLC**
2 North Riverside Plaza, Ste. 1850
Chicago, Illinois 60606
312.300.2522   | mtanner@rtglaw.com

## CERTIFICATE OF SERVICE

I certify that on September 25, 2019, a copy of the foregoing was served on all counsel of record via the Court's Electronic Case Filing system.

  /s/ Matthew D. Tanner