UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| POTBELLY SANDWICH WORKS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 4613 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| RONALD GRASON, JAMES HESSMER, MICHAEL MONTALTO, ANTHONY BUGLIO, HIGH MOUNTAIN CONSULTING, INC., TECHCULE, LLC, NETWORK INNOVATIONS, INC., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Potbelly Sandwich Works, LLC brings this suit against Network Innovations, Inc. ("Nitel") and its officers Ronald Grason and James Hessmer (collectively, "Nitel Defendants"), High Mountain Consulting, Inc. and its owner Michael Montalto (together, "High Mountain Defendants"), and Techcule, LLC and its owner Anthony Buglio, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and Illinois law. Doc. 49. Other than Techcule, which has not appeared, Defendants move under Civil Rule 12(b)(6) to dismiss the operative complaint. Docs. 52, 57, 61. Their motions are granted as to the RICO claim and denied as to the CFAA claim, and if Potbelly does not successfully replead its RICO claim, the court will exercise its discretion under 28 U.S.C. § 1367(c)(2) to relinquish its supplemental jurisdiction over the state law claims.

### Background

In resolving Defendants' Rule 12(b)(6) motions, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See*

*Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Potbelly's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013). The facts are set forth as favorably to Potbelly as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

### A. The Alleged Kickback Scheme

Potbelly operates sandwich shops across the United States. Doc. 49 at ¶ 15. In 2015, Potbelly hired Montalto and Buglio to work in its information technology ("IT") department, eventually promoting Montalto to Senior Director of IT and Buglio to Manager of Infrastructure and Networking Services. *Id*. at ¶¶ 17-19.

Nitel, a provider of integrated network and telecommunications services, conspired with Montalto and Buglio to steer Potbelly's telecommunications business to Nitel, which in return paid them kickbacks via purported commissions. *Id*. at ¶¶ 21-22, 29. Montalto and Buglio each formed a business entity to receive the kickbacks. *Id*. at ¶¶ 11-12. In September 2016, Nitel and High Mountain (Montalto's corporation) entered into an agreement authorizing Montalto to "refer and solicit orders" from prospective commercial subscribers. *Id*. at ¶ 23 (internal quotation marks omitted); *see* Doc. 1-1. In 2016 or late 2017, Nitel and Techcule (Buglio's limited liability company) entered into a similar agreement. Doc. 49 at ¶ 24; *see* Doc. 1-2.

Less than four weeks after entering into the High Mountain agreement, Nitel executed its first service agreement with Potbelly, with Montalto ostensibly acting on Potbelly's behalf. Doc.

49 at ¶ 26; *see* Doc. 1-3.  Under the service agreement, Nitel issued order forms under which it provided telecommunications services to various Potbelly stores.  Doc. 49 at ¶ 26.  Montalto began executing order forms on Potbelly's behalf, and Nitel paid Montalto (via High Mountain) a kickback for each.  *Id*. at ¶¶ 27, 29; *see* Doc. 1-4.  By July 2018, Nitel was providing telecommunications services to over seventy Potbelly stores.  Doc. 49 at ¶ 27.  Nitel charged inflated rates, resulting in Potbelly paying hundreds of thousands of dollars to Nitel, which in turn paid tens of thousands of dollars in kickbacks to Montalto and Buglio.  *Id*. at ¶¶ 28-29.

   **B.**  **Concealment of the Kickback Scheme**

   Nitel, Montalto, and Buglio concealed the kickback scheme from Potbelly.  *Id*. at ¶ 36. On January 27, 2017, Montalto wrote to Grason, Nitel's President, *id*. at ¶ 7, with information to ensure that his "commissions … w[ould] be paid correctly."  *Id*. at ¶ 32 (internal quotation marks omitted).  Grason instructed the Nitel employee responsible for commissions that the fifteen percent commission checks should be "cut directly" to High Mountain, *id*. at ¶ 34, with High Mountain then passing on a portion to Techcule.  *Id*. at ¶ 35.  Nitel at times issued separate checks to High Mountain and Techcule, requiring Grason to circumvent a feature of Nitel's accounting software that prohibited split commissions.  *Id*. at ¶¶ 31, 33.

   Hessmer, Nitel's Senior Sales Executive, *id*. at ¶ 8, ensured that Potbelly's order forms would conceal that Montalto was acting as Nitel's agent.  *Id*. at ¶¶ 37-39.  On July 11, 2017, Hessmer directed Nitel employees to leave blank or write "No" on the section of the forms for listing Nitel's agent.  *Id*. at ¶¶ 38-39.  Hessmer also directed Nitel employees to misrepresent agent information on all non-internal Potbelly-related documents because the "deal [might] detonate" if Potbelly learned that Montalto had a financial interest in directing business to Nitel. *Id*. at ¶ 40 (internal quotation marks omitted).  Hessmer instructed Nitel employees to include the correct information on all internal Nitel documents.  *Ibid*.

Montalto and Buglio concealed the kickback scheme from Potbelly and later destroyed records to cover it up. *Id*. at ¶ 41. To support the scheme, Buglio and Montalto used their Potbelly-provided laptop computers to access company information, including email accounts of several senior Potbelly officers, without justification and in excess of their respective authorizations. *Id*. at ¶¶ 44, 93-94.

### C. Potbelly's Termination of Montalto and Buglio

Potbelly discovered the kickback scheme and terminated Montalto and Buglio on July 20, 2018. *Id*. at ¶¶ 9-10, 42. Potbelly demanded that Nitel cease all payments to Montalto and Buglio and account for the overpayments that Potbelly made to Nitel. *Id*. at ¶ 42. Nitel did not comply with either demand or acknowledge the scheme's existence. *Ibid*. Potbelly began transitioning its shops away from Nitel's telecommunications services. *Id*. at ¶ 43. Despite Potbelly's discovery of the scheme in July 2018, the complaint alleges that the scheme continued "through at least April 2019." *Id*. at ¶ 66. Potbelly alleges that two other entities—Lettuce Feed You 1, LLC, a "Potbelly franchisee," and Press Ganey, a "healthcare-related company"—were "also charged inflated rates that resulted in undisclosed kickback[s]." *Id*. at ¶¶ 74-75.

## Discussion

### I. RICO Claim

Potbelly claims that Grason, Hessmer, Montalto, and Buglio engaged in a RICO conspiracy under 18 U.S.C. § 1962(d) to violate § 1962(c). Doc. 49 at ¶¶ 57-82. To state a § 1962(d) claim for conspiring to violate § 1962(c), Potbelly must plead facts sufficient to show, among other things, "that (1) the defendant[s] agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant[s] further agreed that someone would commit at least two predicate acts to accomplish these goals." *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d

4

723, 734-35 (7th Cir. 2014) (alterations in original) (internal quotation marks omitted). To plead the "pattern of racketeering activity" element, Potbelly must allege conspiratorial acts that are related and pose a continuing threat—components of that element referred to as "relationship" and "continuity." *See Corley v Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1002 (7th Cir. 2004). It is necessary here to address only the continuity component.

> The Seventh Circuit has described "continuity" as follows:
>
>> Continuity can be a closed- or open-ended concept. Closed-ended continuity refers to criminal behavior that has ended but the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future. In contrast, open-ended continuity requires a showing of past conduct that by its nature projects into the future with a threat of repetition.

*DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011) (internal quotation marks and citations omitted). Potbelly argues that the complaint sufficiently pleads open- and closed-ended continuity. Doc. 67 at 14. It is wrong as to both.

As to open-ended continuity, Potbelly points to the complaint's allegation that the kickback scheme either continues or poses a threat of repetition. *Id.* at 11, 14-17. Because the scheme has ended insofar as it was directed at Potbelly, Doc. 49 at ¶ 43, Potbelly is left to argue that Grason, Hessmer, Montalto, and Buglio are "continuing to perpetrate similar frauds on other [Nitel] customers, specifically … Lettuce Feed You 1, LLC, a Potbelly franchisee in Indiana … and Press Ganey, an Indiana-based healthcare-related company." Doc. 67 at 11. But the complaint in fact does not allege that the scheme continues as to those two customers. The complaint's only allegation regarding Lettuce Feed You states:

> [Lettuce Feed You] was also charged inflated rates [by Nitel] that resulted in undisclosed kickback payments to Montalto/High Mountain in at least 2017 and 2018, making it a distinct victim of these defendants' scheme. Beginning no later than April 2017, Nitel sent invoices each month to Lettuce Feed You via the U.S. mail, and in approximately mid-2018 Nitel began sending the

5

...

<small>
</small>

> invoices via interstate wires, as email attachments sent from Illinois to Indiana. Nitel then issued 15-percent kickback payments to High Mountain.

Doc. 49 at ¶ 74. And the complaint's only allegation regarding Press Ganey states:

> Nitel utilized the same fraudulent pattern to overbill for services to, and pay kickbacks to an employee of, South Bend, Indiana-based Press Ganey, a healthcare-related company. As to this fraudulent activity directed toward Press Ganey, a third party, Potbelly lacks access to specific information with regard to the exact time frame and other details, and intends to uncover such details through the discovery process. Fraudulent invoices were sent to Press Ganey, and payments on those invoices have been made by Press Ganey, over a period of years utilizing the U.S. mail and/or interstate wires.

*Id.* at ¶ 75.

The allegation concerning Lettuce Feed You points to bad acts that occurred at unspecified times in 2017 and 2018, and does not suggest that there are ongoing violations or threats of future harm. The allegations concerning Press Ganey are vague and conclusory, involving an unnamed employee committing unspecified actions at unspecified times, with no mention of ongoing violations or threats of future harm. Those allegations do not suffice to establish open-ended continuity. *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 783 (7th Cir. 1994) ("A threat of continuity cannot be found from bald assertions such as 'James Elliot continues his racketeering activities.'"); *Luis v. Smith Partners & Assocs., Ltd.*, 2012 WL 5077726, at *4 (N.D. Ill. Oct. 18, 2012) (holding that the allegation that "'Defendants … behaved towards many other residents of many other properties acquired in [the purported scheme] in a manner similar to the manner in which they … behaved towards Plaintiffs'" did not plead open-ended continuity, reasoning that "allegations that Defendants continue[d] to engage in racketeering activity [we]re vague and conclusory, involving unnamed victims and unspecified actions"); *Patel v. Mahajan*, 2012 WL 3234397, at *4 (N.D. Ill. Aug. 6, 2012) (holding that the complaint's allegation "that the predicate acts continue[d] … fail[ed] to

6

adequately plead open-ended continuity," reasoning that the plaintiffs "provide[d] no details to support th[at] allegation"); *Guar. Residential Lending, Inc. v. Int'l Mortg. Ctr.*, 305 F. Supp. 2d 846, 860 (N.D. Ill. 2004) ("Plaintiff conclusorily alleges that defendants' conduct represented a regular way of doing business and a threat of continued conduct. Such conclusory allegations, however, are not sufficient to allege open-ended continuity, [as] specific facts must support such a conclusion."); *Johnson Controls, Inc. v. Exide Corp.*, 132 F. Supp. 2d 654, 661 (N.D. Ill. 2001) (noting that "the absence of anything other than a conclusory suggestion of such a continuing threat on [defendant's] part dooms the RICO claim").

Potbelly fares no better as to closed-ended continuity. The existence of closed-ended continuity turns on five factors: "[(1)] the number and variety of predicate acts[,] [(2)] the length of time over which they were committed, [(3)] the number of victims, [(4)] the presence of separate schemes[,] and [(5)] the occurrence of distinct injuries." *Vicom*, 20 F.3d at 780 (internal quotation marks omitted). Those factors must be applied "with an eye toward achieving a natural and commonsense result, recognizing that Congress was concerned in RICO with long-term criminal conduct." *Ibid.* (internal quotation marks omitted). Applying those factors here shows that Potbelly does not adequately allege closed-ended continuity.

First, the only "predicate acts" alleged by Potbelly are mail and wire fraud. Doc. 49 at ¶¶ 60, 62-63, 68-70, 72, 74-75, 81. The Seventh Circuit has cautioned courts "not [to] look favorably on many instances of mail and wire fraud to form a pattern," and has observed that, "when it comes to a pattern premised on acts of mail or wire fraud, the volume of mailings is not dispositive." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1024-25 (7th Cir. 1992) (internal quotation marks omitted) (collecting cases). For example, *Midwest Grinding* held that "hundreds" of allegedly fraudulent invoices "directed to a few customers" who were all "very

7

similar to one another" failed to "show that the defendants operated a long-term criminal operation." *Ibid*. Potbelly identifies only twenty-five instances of mail and wire fraud—not hundreds—all committed against Potbelly. Doc. 67 at 11. And even considering the vague allegations concerning Lettuce Feed You and Press Ganey, the complaint still identifies only "a few customers" who are "very similar to one another." *Midwest Grinding*, 976 F.2d at 1025. The first factor weighs against Potbelly. *See Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 475 (7th Cir. 2007) ("[The plaintiff] has not alleged a sufficient number and variety of predicate acts to show a RICO violation. … Other than the evidence-tampering allegations, which … generally stem from acts that are also alleged to be mail or wire fraud, all we have here is a few instances of mail and wire fraud. We have repeatedly rejected RICO claims that rely so heavily on mail and wire fraud allegations to establish a pattern."); *Vicom*, 20 F.3d at 781 ("Although [the plaintiff]'s prolixity makes it seem as though [it] alleges innumerable predicate acts to support its causes of action, a careful reading of the amended complaint reveals otherwise. When all the verbiage is weeded out, [the plaintiff] manages to allege a very few acts of mail or wire fraud in each count.") (internal quotation marks and citation omitted).

Second, Potbelly alleges that the predicate acts took place over the course of twenty-five months. Doc. 49 at ¶ 76; Doc. 67 at 11. Duration of the enterprise is "perhaps the most important element of RICO continuity." *Jennings*, 495 F.3d at 474 (internal quotation marks omitted). In many cases, the Seventh Circuit "ha[s] not hesitated to find that closed periods of several months to several years did not qualify as substantial enough to satisfy continuity." *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty.*, 424 F.3d 659, 673 (7th Cir. 2005) (internal quotation marks omitted); *see Midwest Grinding*, 976 F.2d at 1024 (collecting cases, including cases where schemes lasting a "period of years[,]" "several years[,]", and "eighteen-month[s]"

8

were held insufficient); *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 820-21 (7th Cir. 1991) (holding thirteen months insufficient); *U.S. Textiles, Inc. v. Anheuser-Busch Cos., Inc.*, 911 F.2d 1261, 1267 (7th Cir. 1990) (holding sixteen months insufficient). Elsewhere, however, the Seventh Circuit has indicated that schemes of shorter duration are sufficient. *See Vicom*, 20 F.3d at 780 (noting that the Seventh Circuit has "not ventured as far as the Third Circuit in holding that predicate acts spanning less than one year do not as a matter of law constitute a substantial period of time as required" to establish closed-ended continuity) (internal quotation marks omitted). Thus, the duration of the scheme alleged by Potbelly is not determinative.

Third, the complaint focuses almost exclusively on one victim, Potbelly, which cuts against finding closed-ended continuity. *See Jennings*, 495 F.3d at 475 (holding that closed-ended continuity was not present where the plaintiff was "the only identifiable individual who has suffered any potential injury"). Even counting Lettuce Feed You and Press Ganey, the complaint still would identify only "a small group" harmed by the scheme, which likewise is insufficient. *Roger Whitmore's Auto. Servs.*, 424 F.3d at 673 (holding that there was no closed-ended continuity where the plaintiff identified a "dozen or so" victims).

Fourth, the only scheme Potbelly identifies with any degree specificity is overcharging for telecommunications services, which also cuts against closed-ended continuity. *See id*. at 674 (holding that the existence of a single scheme weighs against closed-ended continuity); *U.S. Textiles*, 911 F.2d at 1269 (same); *Sutherland v. O'Malley*, 882 F.2d 1196, 1204 (7th Cir. 1989) (same).

Fifth, the complaint identifies only one set of injuries (Potbelly's) with any degree of specificity. *See Jennings*, 495 F.3d at 476 (holding that there was no closed-ended continuity where the plaintiff suffered the only identifiable injuries); *Lipin Enters. Inc. v. Lee*, 803 F.2d

9

322, 324 (7th Cir. 1986) ("There must be some indication of a threat of continuing activity by the defendants, not just one instance of fraud with a single victim.") (internal quotation marks omitted). Even considering the complaint's cursory references to Lettuce Feed You and Press Ganey, three sets of injuries remain insufficient for closed-ended continuity, especially because Potbelly does not allege that any victim is suffering continuing harms. *See Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 662-63 (7th Cir. 1992) (holding that the plaintiffs failed to state a RICO claim even though the defendants' alleged scheme injured more than one victim); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1263 (D.C. Cir. 1995) (holding that the plaintiffs did not satisfy closed-ended continuity where they alleged a "single scheme" against "a small number of victims," adding that it was "virtually impossible for plaintiffs to state a RICO claim" based on such allegations).

With four of the five factors weighing against Potbelly and the fifth being a wash, the complaint does not sufficiently allege closed-ended continuity. *See Gamboa v. Velez*, 457 F.3d 703, 709 (7th Cir. 2006) (holding that there was no closed-ended continuity, "even [though] the purported scheme [took] several years to unfold, involve[d] a variety of criminal acts, and target[ed] more than one victim," reasoning that "[t]he district court erred in allowing the factors to over-ride the big picture" that "the amended complaint's allegations foreclosed any threat of continued criminal activity"); *Roger Whitmore's Auto. Servs.*, 424 F.3d at 674 ("[T]he fact that we are faced with a single, isolated scheme with a confined set of victims also supports the conclusion that [the plaintiff] has not shown closed-ended continuity."). And because Potbelly fails to satisfy either open- or closed-ended continuity, it does not sufficiently allege the "pattern of racketeering activity" element of its § 1962(d) claim, requiring that the claim be dismissed.

10

### II. CFAA Claim

Potbelly's other federal claim is its CFAA claim against Montalto and Buglio. Doc. 49 at ¶¶ 92-103. To state a CFAA claim, Potbelly must allege facts showing that: (1) there was "a violation of [18 U.S.C. § 1030(a)]"; (2) "the [violation] involve[d] [one] of the factors set forth in [various subclauses] of subsection (c)(4)(A)(i)," with the only pertinent subclause here being that Potbelly suffered "loss … during any 1-year period … aggregating at least $5,000 in value," 18 U.S.C. § 1030(c)(4)(A)(i)(I); (3) Potbelly brought the action "within [two] years of the date of the act complained of or the date of the discovery of the damage"; and (4) the complained-of conduct is not "for the negligent design or manufacture of computer hardware, computer software, or firmware." 18 U.S.C. § 1030(g). The third and fourth elements are easily met, so the CFAA claim survives if Potbelly alleges facts sufficient to meet the first two elements. Potbelly succeeds in doing so.

As to the first element, Potbelly alleges three separate violations of § 1030, Doc. 49 at ¶¶ 94-95, 99; Doc. 67 at 19-20, but it is necessary to consider only the alleged § 1030(a)(2)(C) violation. Section 1030(a)(2)(C) states that "whoever … [(1)] intentionally accesses a computer [(2)] without authorization or exceeds authorized access, [(3)] and thereby obtains … information from [(4)] any protected computer … shall be punished as provided in [§ 1030(c)]." 18 U.S.C. § 1030(a)(2)(C). The complaint alleges that Montalto and Buglio "gain[ed] unauthorized access to Potbelly's computer systems, including hacking into emails" of "multiple Potbelly employees and officers, including Potbelly's CEO, its Senior Vice President for Information Technology, and its Senior Vice President for Human Resources," and that they "reviewed and captured the substance of email communications to and from th[ose] employees and officers." Doc. 49 at ¶¶ 93-94. That suffices to state a § 1030(a)(2)(C) violation, as the

11

alleged conduct amounts to the (1) intentional use of a computer, (2) without authorization, (3) to obtain information from (4) Potbelly's protected computers.

Pressing the contrary result, Montalto argues that he had authorization to do what he did because, "[a]s the Senior Director of IT, it was [his] *job* to access, administer, and oversee all Potbelly email accounts." Doc. 58 at 11. That argument fails, at least at the pleading stage, because the court must take as true Potbelly's allegation, Doc. 49 at ¶ 93, that Montalto accessed those email accounts without authorization. *See Zahn*, 815 F.3d at 1087.

As to the second element, the CFAA defines "loss" to include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense." 18 U.S.C. § 1030(e)(11). The complaint alleges that Potbelly "incurred more than $5,000 in expenses within a one-year period" when it had to "conduct[] a damage assessment and restor[e] data" due to Montalto and Buglio's unauthorized access of its officers' email accounts. Doc. 49 at ¶ 103. That allegation, which must be credited at this stage, *see Zahn*, 815 F.3d at 1087, qualifies as a loss sufficient under § 1030(c)(4)(A)(i)(I), and thus suffices to plead the second element of Potbelly's CFAA claim.

Potbelly's CFAA claim against Montalto and Buglio may proceed.

### III. State Law Claims

Because the parties are not completely diverse, Doc. 49 at ¶¶ 5-13, Potbelly's state law claims fall within the court's supplemental jurisdiction under 28 U.S.C. § 1367(a). The court had the discretion under § 1367(c) to relinquish its supplemental jurisdiction, and the question whether to do so remains open "at every stage of the litigation." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks omitted). If Potbelly does not attempt to replead its RICO claim, or if Potbelly unsuccessfully attempts to replead that claim,

the court would relinquish its supplemental jurisdiction over the state law claims under § 1367(c)(2)—which provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if … (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction"—because Potbelly's state law claims predominate over its CFAA claim. This is so for two reasons.

First, the CFAA claim involves conduct distinct from and far narrower than the conduct underlying the state law claims. "The CFAA … is primarily a[n] … anti-hacking statute," *Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016), and Potbelly's CFAA claim focuses on Montalto and Buglio's alleged unauthorized access to its senior officers' email accounts, Doc. 49 at ¶¶ 92-103. By contrast, Potbelly's state law claims—alleging breach of fiduciary duty, inducement of breach of fiduciary duty, fraud, civil conspiracy, violation of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, unjust enrichment, fraudulent inducement, and seeking a declaratory judgment that Potbelly's contracts with Defendants are void—focus on the alleged kickback scheme. Doc. 49 at ¶ 51 ("By accepting money from Nitel in return for steering Potbelly's business to Nitel, Montalto and Buglio breached their fiduciary duties of loyalty."); *id.* at ¶ 91 ("As a direct and proximate result of defendants' fraudulent acts and omissions, Potbelly suffered damages … including the inflated costs of the services provided by Nitel, and the costs associated with replacing Nitel with a responsible vendor."); *id.* at ¶ 105 ("[Defendants] formed an agreement to corrupt and compromise the loyalties that Montalto and Buglio owed to Potbelly and to defraud Potbelly, whereby Montalto and Buglio would exercise their employment responsibilities for the benefit of the defendants and to the detriment of Potbelly."); *id.* at ¶ 110 ("The acts of Nitel, Grason[,] and Hessmer in corrupting the loyalties of Potbelly's agents, benefiting from the non-competitive

13

award of telecommunications services, and concealing the arrangement from Potbelly constitute deceptive acts and practices."); *id*. at ¶ 119 ("Hessmer has retained [kickbacks] to Potbelly's detriment, and his retention of those benefits violates fundamental principles of justice, equity[,] and good conscience."); *id*. at ¶ 122 ("Nitel was aware … that it had corrupted the loyalties of Montalto and Buglio, and affirmatively misrepresented and concealed that fact to induce Potbelly to permit Nitel to obtain and keep Potbelly's business as a telecommunications provider charging inflated rates."); *id*. at ¶ 129 ("A contract procured under circumstances where one party's agent was also acting as the undisclosed agent of the adverse party is not binding upon the uniformed principal, and is voidable at the option of the uninformed principal."). Potbelly's state law claims thus have a broad factual scope, encompassing an alleged conspiracy involving multiple individuals and three corporations, and legal complexity, presenting eight causes of action under Illinois law. By contrast, Potbelly's CFAA claim is factually and legally narrow, concerning whether Montalto and Buglio hacked certain computers and caused Potbelly to suffer a loss of at least $5,000. The state law claims thus predominate over the CFAA claim. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 727 (1966) ("Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed."); *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003) (same); *cf. Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 980 (7th Cir. 2011) (holding that the plaintiff's state law claims did not predominate where they "essentially replicate[d] the [federal] claims").

Second, the potential damages for the state law claims greatly exceed the potential damages for the CFAA claim. Damages under the CFAA "are limited to economic damages," 18 U.S.C. § 1030(g), and Potbelly's alleged CFAA damages arise from the relatively minor costs

14

it incurred in conducting a damage assessment and restoring data due to Montalto and Buglio's hacking. Doc. 49 at ¶ 103. The state law claims, by contrast, seek damages arising from the alleged kickback scheme, which are separate from and far greater than the alleged CFAA damages. *Id*. at ¶¶ 29, 138 (alleging that "Potbelly has paid hundreds of thousands of dollars to Nitel," which then "paid tens of thousands of dollars in kickbacks," and that Nitel now claims it is "entitle[d] to hundreds of thousands of dollars in early termination fees").

Accordingly, if Potbelly does not attempt to replead its RICO claim—which, unlike the CFAA claim, rests on the same broad factual predicate as its state law claims—or if Potbelly unsuccessfully attempts to replead its RICO claim, its state law claims would predominate over its remaining federal claim, and the court would relinquish its supplemental jurisdiction over the state law claims under § 1367(c)(2).

## Conclusion

Nitel Defendants' motion to dismiss is granted, and High Mountain Defendants' and Buglio's motions to dismiss are granted except as to the CFAA claim. The dismissal of the RICO claim is without prejudice. *See Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend [its] complaint before the entire action is dismissed."). Potbelly has until September 8, 2020 to amend the operative complaint. If Potbelly does not amend, the dismissal of the RICO claim will convert automatically to a dismissal with prejudice, the court will relinquish it supplemental

jurisdiction over the state law claims, and this case will proceed on the CFAA claim. If Potbelly amends, Defendants shall file their responsive pleadings by September 29, 2020.

August 17, 2020                _____
                          United States District Judge